# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                                                       Case No. 07-Cr-0111

LARRY EDWARD TATE,

    Defendant.

## MAGISTRATE JUDGE'S RECOMMENDATION TO THE HONORABLE RUDOLPH T. RANDA

## NATURE OF CASE

On May 8, 2007, a federal grand jury sitting in this district returned a one-count indictment against the defendant, charging him with being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2). On May 29, 2007, the defendant appeared before United States Magistrate Judge Aaron E. Goodstein for arraignment, entering a plea of not guilty. Pursuant to the pretrial scheduling order issued at that time, the defendant has filed a Motion to Suppress Search of Defendant. (Docket #7). This motion will be addressed herein.

## MOTION TO SUPPRESS SEARCH OF DEFENDANT

On June 28, 2007, the court conducted an evidentiary hearing on the defendant's motion to suppress statements. At the hearing the following individuals testified on behalf of the government: Milwaukee Police Officers Arthur Kleist and Ted Jansen. The defendant,

Larry Edward Tate testified on his own behalf. Based on the stipulation of the parties and the evidence presented at the hearing, the court makes the following findings of fact.

### Findings of Fact

On March 23, 2007, Milwaukee Police Officer Arthur Kleist and his partner, Officer Ted Jansen, were working the day shift from 7:00 a.m. to 3:00 p.m. in the Avenues West area in the City of Milwaukee, Wisconsin. The area has had problems with drug trafficking, prostitution and loitering. Prior to going to their assigned area, both officers had reviewed the Major Crime Summary which apprises Milwaukee Police officers of felony offenses which had occurred in the previous 24 hours. This is a computer generated report which is issued daily.

The Major Crime Summary reported that a strong arm robbery of a blue mountain bike had occurred at approximately 9:30 p.m. the previous evening at 201 N. 27th Street. The suspect in the strong armed robbery was described as a black male, in his 30's, approximately six feet tall, 130 lbs, wearing jeans and a dark shirt.

At approximately 7:30 a.m. on March 23, 2007, Officers Kleist and Jansen, who had just started their shift, saw two black men in their 30's, both wearing jeans and dark colored jackets, pushing a blue and silver mountain bike in the 2100 block of West Michigan Avenue, which was a few blocks away from the site of the robbery. Officer Kleist[1] was a passenger in a marked patrol car driven by Officer Jansen when they observed two individuals who were subsequently identified as the defendant and his friend, Errand Williams. The officers decided to conduct a field interview.

---

[1] Officer Kleist is currently assigned to the Harbor Patrol and is no longer at District #3 where he was assigned when the incident at issue occurred.

Officer Jansen stopped the patrol car and the two officers got out and approached the two men with the bike. Officer Kleist identified himself to the two individuals and explained that he wanted to talk to them about a report of a stolen bicycle. Neither officer displayed their weapons. Officer Kleist could not recall if he asked the defendant for his identification, although his usual practice is to ask for an individual's name first and then ask for some identification. The man pushing the bike identified himself as Errand Williams. When they stopped the two men with the bike, Officer Jansen focused on the defendant's companion. He asked him if he had any identification, but the individual had no written identification. He could not recall if the defendant had identification. The officers were not immediately concerned for their safety since the men were not acting in a threatening manner or in a way that gave them concern for their safety.

When Officer Kleist was speaking to the defendant, the defendant said to him, "You know me." Officer Kleist recognized the defendant because he had ticketed him a week earlier for a municipal offense after he had encountered him at an apartment complex at 29th and Wells Streets. The police department had received many drug complaints from that apartment complex and the previous week, a private security guard hired by the apartment complex had registered a complaint with the police department that a person had violated the no trespass order at the complex. Officer Kleist had gone to the complex in response to the complaint. When Officer Kleist arrived, there were nine people in the apartment and the security guard identified the individuals, including the defendant, who were in violation of the no trespass order. Drug paraphernalia, specifically short pipes used to smoke crack cocaine, and crack cocaine were observed in the apartment. The defendant was searched, but no drugs or weapons were found on him.

- 3 -

Case 2:07-cr-00111-RTR    Filed 08/07/07    Page 3 of 13    Document 22

The defendant and seven others persons were conveyed to the Milwaukee Police Department and background checks were done on them. Officer Kleist reviewed the defendant's criminal history at that time, noting that the defendant had arrests for drug possession, robbery and violent crimes. The defendant and the seven other individuals were issued citations and released. Officer Kleist had no other contact with the defendant.

Officer Kleist recalled the defendant's criminal record on March 23, 2007, and described it as "lengthy," consisting of about three pages which he said was longer than average. Based on his experience, Officer Kleist testified that he knew that drugs and weapons go "hand in hand." In Officer Kleist's experience, approximately one-third of the people who are arrested for possession of drugs are carrying a knife or some other weapon.

When questioned about the bike, Mr. Williams stated that the bike belonged to his cousin. Based on his experience, Officer Kleist knew that people sometimes lie to the police so the officers wanted to verify ownership of the bicycle by checking the serial number on the bike. In order to do so, the bike had to be turned over because the serial number is on the bottom of the bike. Obtaining the serial number of the bicycle was important for purposes of identification and it was the reason for the stop.

Officer Kleist asked the defendant, "Are you holding anything now?" The defendant said no. Officer Kleist advised the defendant that he was going to pat him down and asked the defendant, "Do you have anything on you that could hurt me?" The defendant did not reply and nervously stared straight ahead. Officer Kleist again asked the defendant if he had anything on his person that could hurt the officer during the pat down. The defendant stated that he had a gun. Officer Jensen heard Officer Kleist ask the defendant if he had anything on

- 4 -

him and the defendant said he had a gun. Officer Jensen was not paying close attention to the defendant since his focus was on Mr. Williams.

Officer Kleist recovered a Smith & Wesson, model 2213, .22 caliber pistol, bearing serial number UBA3073 from the defendant's inner jacket pocket. The defendant, who is a convicted felon, was arrested.

According to Officer Kleist, after the defendant was patted down, Officer Jensen turned the bicycle over and obtained the serial number from the bottom of the bike. The number then was then run through police records to see if the vehicle was stolen. In addition to running the serial number of the bicycle, the names of the defendant and Mr. Williams were also checked through police records. The officers received the results of the serial number check, which indicated that the bike was not stolen. Mr. Williams and the bike then were released.

Officer Kleist patted down the defendant for weapons based on concerns for the officers' safety. Officer Jensen patted down Mr. Williams. The officers were concerned for their safety since there were only two officers present with the two men. The officers had to focus on the bike. According to Officer Kleist, the time between when they initially observed the bicycle until the weapon was found on the defendant was approximately two to three minutes. Officer Kleist only stopped the defendant and his friend because of the bike. They observed no other suspicious activity.

Defendant Larry Edward Tate testified that he was walking with his friend, Errand Williams, in the area of 24th and Michigan when he observed a police squad parked in a parking lot. Subsequently the officers followed the two men and pulled up in the squad car. The officers exited the squad car and then asked if they could talk to him and Mr. Williams. Officer Kleist asked the defendant for his identification. The defendant reached into his back

pocket and gave his identification to Officer Kleist and said to him, "you already know me." The defendant told Officer Kleist that he had given him a ticket earlier. Officer Kleist then said that he remembered the defendant. The defendant told Officer Kleist that he initially was going to fight the ticket and call witnesses to testify for him. Officer Kleist did not seem to care about the earlier ticket.

Officer Jensen took possession of the bike and said they needed to check if the bike was stolen. Officer Jensen was looking for the serial number under the seat and then he turned the bike upside down. According to the defendant, he was patted down after Officer Jensen obtained the bike's serial number and after he wrote down the number. The defendant described the bike as a small bike that he would not have been able to ride because he was too tall.

The defendant testified that he was not paying attention to the officers when they approached him. He was concerned because he had a weapon and he was a convicted felon. His focus was Officer Kleist and he did not know what Officer Jensen was doing. He did not see Officer Jensen pat down Mr. Williams. The defendant testified that he has three or four felony convictions for drug trafficking and a conviction for carrying a concealed weapon.

## **Analysis**

In moving to suppress the search, the defendant asserts that the officers lacked reasonable suspicion to make an investigative stop involving the defendant and that, therefore, Officer Kleist had no grounds to conduct a protective pat down search of him. The defendant contends that the ten hour interval between the time of the robbery and the stop of the defendant and Mr. Williams, together with the discrepancies in the physical descriptions of the robbers and the defendant and Mr. Williams, negates any claim that the officers had a

reasonable suspicion to conduct the stop. The defendant states that the stop was converted into a seizure when the officers took the identification information of the defendant and proceeded to run records checks. He states that no reasonable person would have believed that he was free to leave at that point.

The defendant also asserts that his disclosure of the gun was not voluntary because it occurred after Officer Kleist told him that he was going to conduct a pat down search. He asserts that he produced the firearm only because Officer Kleist told him that he would be searched.

In opposing the motion, the government maintains that the officers were entitled to conduct a field interview of the defendant and Mr. Williams, asserting that no suspicion at all is required in such a case, citing United States v. Burton, 441 F.3d 509, 511 (7th Cir. 2006), cert. denied, ___ U.S. ___, 127 S.Ct. 1276 (2007). The government points out that a seizure does not occur merely because a police officer approaches an individual and asks a few questions, citing Florida v. Bostick, 501 U.S. 429 (1991). Asserting that the defendant's admission obviated the need for a pat down search, the government states that Officer Kleist could have conducted a pat down based on reasonable suspicion of criminal activity and concerns for the safety of the officers. It also maintains that the pat down issue is moot since the defendant voluntarily admitted that he had a gun.

The Fourth Amendment bars unreasonable searches and seizures. Maryland v. Buie, 494 U.S. 325, 331 (1990). The Court's decisions show that in determining reasonableness, the Court has "balanced the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Id. (internal citations omitted).

- 7 -

However, "mere police questioning does not constitute a seizure." Bostick, 501 U.S. at 434. Thus, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if the is willing to answer some questions [or] by putting questions to him if the person is willing to listen." Id. (quoting Florida v. Royer, 460 U.S. 491, 497 [1983]).

As the court explained in Burton, 441 F.3d at 511:

> Even though "approaching a person on the street (or at work, or on a bus) to ask him a question causes him to stop for at least the time needed to hear the question and answer (or refuse to answer)," United States v. Childs, 277 F.3d 947, 950 (7th Cir.2002) (en banc), the curtailment of the bystander's mobility, privacy, and peace of mind is so slight that neither probable cause nor reasonable suspicion is required to justify the police action. No suspicion at all is required in such a case . . ..

(Other citations omitted). Thus, no suspicion is required for a stop which does not limit the suspect's freedom. Id. However, a brief detention calls for reasonable suspicion. Terry v. Ohio, 392 U.S. 1, 21 & 30 (1968).

In Terry, 392 U.S. at 21, the Court held that police officers may conduct a brief, investigatory stop of a suspect if they have knowledge of "specific and articulable facts which, taken together with the rational inferences from those facts" could cause them to conclude, in light of their experiences, that criminal activity was afoot. See also, Alabama v. White, 496 U.S. 325, 329-30 (1990). An investigatory stop must be temporary, lasting no longer than is necessary to effectuate the purpose of the stop. Terry, 392 U.S. at 21-22. The investigative methods employed should be the least intrusive means reasonably available to verify or to dispel the officers' suspicion in a short period of time. Royer, 460 U.S. at 506.

"'Reasonable suspicion' must be based on some objective manifestation that the suspect is involved in criminal activity." United States v. Wimbush, 337 F.3d 947, 949 (7th Cir.

- 8 -

2003) (citing United States v. Swift, 220 F.3d 502, 506 [7th Cir. 2000]). The court determines reasonable suspicion based on the totality of the circumstances known to the officer at the time of the stop, including the experience of the officers and the characteristics of the subject. United States v. Lenoir, 318 F.3d 725, 729 (7th Cir. 2003); United States v. Jackson, 300 F.3d 740, 745-46 (7th Cir. 2002); see also, United States v. Sokolow, 490 U.S. 1, 8 (1989). "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability." Alabama, 496 U.S. at 330.

Law enforcement officers may conduct a limited pat-down search of individuals subject to investigatory detention in order to determine whether the person is, in fact, carrying a weapon and to neutralize the threat of physical harm. Terry, 392 U.S. at 24-27. Thus, a police officer may conduct a reasonable search for weapons for his safety, "where he believes that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Id. at 27.

In this case, the officers stopped the defendant and Mr. Williams and explained that they wanted to talk to them about a reported stolen bicycle. The suspect in the strong arm robbery was described as a black male in his 30s, wearing jeans and a dark shirt which generally matched the description of the defendant and his companion. The Major Crimes Summary listed the stolen bicycle as a blue mountain bike; the bicycle in the defendant's possession was a blue and silver mountain bike. The reported robbery occurred about 10 hours earlier, a few blocks from where the officers observed the defendant and Mr. Williams. The officers did not display their weapons and there was no show of force. Based on the information in their possession and under the circumstances, the officers had "specific and articulable facts" which caused them to conclude, in light of their experiences, that the bicycle

- 9 -

might be stolen. Thus, they had reasonable suspicion to conduct a brief investigatory stop of the defendant and Mr. Williams. See Terry, 392 U.S. at 21-22. Accordingly, the defendant's contention that the officers did not have reasonable suspicion to make the stop is without merit.

Nonetheless, even if the court were to conclude that the officers lacked reasonable suspicion at this point, a seizure does not occur simply because a law enforcement officers approaches a person and asks a few questions. Bostick, 501 U.S. at 434. An "encounter with police does not trigger Fourth Amendment scrutiny unless it loses its consensual nature." Id.; Terry, 392 U.S. 19, n. 16 ("Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred").

In this case, as Officer Kleist was speaking with the defendant, the defendant stated, "you know me." At that point Officer Kleist recognized the defendant as a person he had encountered the prior week during an investigation of a drug complaint in an apartment complex at 29th and Wells Streets. Drug paraphernalia and crack cocaine were found in the apartment, but no drugs or weapons were found on the defendant. The defendant and seven other individuals were transported to the Milwaukee Police Department where Officer Kleist reviewed the defendant's lengthy criminal record which included arrests for robbery, drug possession and other violent crimes. Ultimately the defendant and the others were issued citations and released.

During the stop on March 23, 2007, Officer Kleist remembered the defendant and his lengthy criminal record. He also knew, based on his experience, that weapons and drugs

- 10 -

often go "hand in hand."  Under the circumstances, the officers had "specific and articulable facts" which caused them to conclude, in light of their experiences, that the bicycle might be stolen and that a pat down search of the men was warranted.

Officer Kleist decided to pat down the defendant for weapons based on his concern for the safety of the officers.  As he explained, there was a safety concern because he and Officer Jansen were the only officers present with the two men and they needed to check the serial number on the bike to determine if it was stolen.  A police officer may conduct a limited pat down search of a person subject to investigatory detention to determine whether the person is, in fact, carrying a weapon and to neutralize the threat of physical harm.  Terry, 392 U.S. at 24-27.  Therefore, Officer Kleist asked the defendant if he had anything on him that could hurt the officer.  The defendant responded that he had a gun.  Officer Kleist recovered the weapon from the defendant.

Contrary to the testimony of the officers, the defendant testified that the pat down search was conducted after Officer Jansen had written down the serial number of the bicycle. Although on balance, the court finds the testimony of the officers more credible, the factual disagreement between the defendant and the officers is not determinative.  Rather, it is not disputed that the officers stopped the defendant and Mr. Williams to ask them about the bicycle in their possession. It is also undisputed that shortly after the officers approached the men, the defendant told Officer Kleist that the officer knew him from an encounter the prior week.  Officer Kleist recalled the encounter at an apartment complex where drug paraphernalia and crack cocaine were found and he also recalled the defendant's lengthy criminal record, including convictions for robbery, carrying a concealed weapon and felony

- 11 -

drug trafficking. Viewing these objective facts and evaluating the totality of the circumstances, the officers had reasonable grounds to conduct a pat down search of the men.

The defendant maintains that his disclosure of the firearm was involuntary and that he only advised Officer Tate of the firearm because the officer told the defendant he was going to conduct a pat down search. Regardless of the defendant's reasons for revealing that he was carrying a weapon, considering the totality of the circumstances, Officer Kleist had reasonable suspicion to conduct a pat down search of the defendant. See Terry, 392 U.S. 21. Therefore, Officer Kleist would have found the firearm when he conducted the pat down search.

In sum, based on the totality of the circumstances, the court concludes that the officers had reasonable suspicion to stop the defendant and his companion and to conduct a pat down search for the officers' safety. Thus, the court concludes that suppression of the search of the defendant is not warranted. Accordingly, this court will recommend that the United States district judge enter an order denying the defendant's motion to suppress.

## **CONCLUSION**

**NOW, THEREFORE, IT IS HEREBY RECOMMENDED** that the United States district judge enter an order **denying** defendant Larry Edward Tate's motion to suppress the search of the defendant. (Docket #7).

Your attention is directed to 28 U.S.C. § 636(b)(1)(A) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any

- 12 -

Case 2:07-cr-00111-RTR   Filed 08/07/07   Page 12 of 13   Document 22

objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin this 7th day of August, 2007.

BY THE COURT:

s/ Patricia J. Gorence
PATRICIA J. GORENCE
United States Magistrate Judge